OPINION OP THE COURT
Chief Judge Cooke.
Defendant, Victor Licitra, was convicted of manslaughter in the second degree for recklessly causing the death of his wife (Penal Law, § 125.15, subd 1). The Appellate Division reversed the conviction and dismissed the indictment, reasoning that the prosecution failed to establish a sufficient case for submission to the jury. The People now appeal from that determination.
On August 26, 1974 White Plains police received three telephone messages reporting an automobile accident with injuries at 11 Benedict Avenue from a male who, on the third call, identified himself as "Licitra”. Patrol units were quickly dispatched and Officer Michael Sforza was the first' to reach the scene. While attempting to locate the vehicular accident, Sforza suddenly was stopped by defendant, who informed him that there had been an accidental shooting. The officer then accompanied defendant into his home on Benedict Avenue. Upon entering the living room, Sforza observed Mrs. Licitra, defendant’s wife, slumped over in a chair, unconscious, blood seeping from a fresh head wound. Directly behind the chair was a .38 caliber Smith and Wesson revolver. Sforza promptly sought to ascertain whether Mrs. Licitra was alive and, after feeling a weak pulse, radioed for medical assistance.
In the interim, Detective Robert Pockl arrived and was let into the house by defendant. The detective asked defendant what had happened, and defendant answered that he was taking the gun out and it went off. Defendant repeated the explanation a number of times and each time supplied a visual description of the event by moving his right hand from the belt area on his left side across his body toward the right. In response to a further question, defendant indicated that he possessed a permit for the gun, which he later produced. He dlso related that he had been at a firing range earlier in the *557 day but returned home when it began to rain. He stated he was taking the gun out to put it away when it went off.
Defendant was taken to the police station, and that same afternoon was placed under arrest. Five days later Mrs. Licitra died. A Westchester County Grand Jury subsequently returned an indictment charging defendant with one count of manslaughter in the second degree and one count of criminally negligent homicide.
At trial, the prosecution contradicted defendant’s version of these events in a number of ways. Specifically, the People produced a witness who related that the firing range defendant claims to have attended was closed on the day in question, and that defendant’s membership at the range had expired some six months earlier. Most important, however, was the testimony of Deputy Sheriff Joseph Reich, a ballistics expert, who had undertaken a detailed examination of defendant’s revolver. According to Reich, this particular weapon could be fired in either of two ways: the single action method where the hammer is placed in the fully cocked position and three pounds of pull is exerted on the trigger; or, the double action method where the hammer is in the rest position, in which case 10 pounds of pressure on the trigger is required to discharge a bullet. Because of internal safety devices, the weapon would not fire unless the required pressure were exerted on the trigger, even if the hammer were in the cocked position. These safety mechanisms were inspected by Deputy Reich and found to be functioning properly. Thus, this testimony, if credited, establishes that the gun could not have gone off without defendant’s finger being on the trigger exerting 3 and perhaps 10 pounds of pressure. The question is whether, on this record, a prima facie case was made out.
At common law, a person committed the crime of involuntary manslaughter, the historic foundation for the modern second degree manslaughter statute, when he caused the death of another through culpable or criminal negligence (see, e.g., People v Angelo, 246 NY 451, 454-455; La Fave & Scott, Criminal Law, § 78; 1 Warren, Homicide, § 86, at pp 420-421). Although the authorities generally agreed that something more than ordinary negligence needed to be shown before criminal liability would attach, the precise degree of risk required was fraught with uncertainty (see La Fave & Scott, Criminal Law, § 30, pp 211-213; cf. People v Eckert, 2 NY2d 126, 130-131; People v Buddensieck, 103 NY 487). Particularly *558 unsettled in the various jurisdictions was the question whether a defendant had to possess a subjective awareness of the risk which caused the death in order to be guilty of manslaughter (compare Commonwealth v Pierce, 138 Mass 165 [Holmes, J.], with Bussard v State, 233 Wis 11; see, also, People v Decina, 2 NY2d 133).
Much of the confusion was dissipated with the adoption of the new Penal Law in 1968. In that statute, the Legislature, embracing the approach advocated by the drafters of the Model Penal Code (see People v Haney, 30 NY2d 328, 332-333), created a distinction between criminal negligence and recklessness (Penal Law, § 15.05). A person is chargeable with recklessness when he is aware of a designated risk and consciously disregards it, while he is only criminally negligent if he fails to perceive the risk (Penal Law, § 15.05, subds 3, 4; People v Montanez, 41 NY2d 53, 56; People v Stanfield, 36 NY2d 467, 470). In addition, the Legislature has delineated, so far as possible, the degree of risk necessary for recklessness or criminal negligence: "The risk must be of such nature and degree that disregard thereof [or failure to perceive it] constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation” (Penal Law, § 15.05, subds 3, 4). Thus, to establish manslaughter in the sfecond degree, the prosecution must prove three elements: the creation of a substantial and unjustifiable risk; an awareness and disregard of the risk on the part of defendant; and a resulting death.
Ordinarily, the question whether the risk was of the type condemned by the Penal Law is to be decided by the trier of the facts, aided by appropriate instructions (e.g., People v Haney, 30 NY2d 328, 335, supra; see People v Angelo, 246 NY 451, 457-458, supra). In certain limited instances, however, where it is clear that the risk involved does not rise to the level of criminality, the court may be justified in concluding that the People have failed to carry their burden of proving a prima facie case (cf. People v Bearden, 290 NY 478). By the same token, where the prosecutor’s case rests entirely upon circumstantial evidence, a conviction for second degree manslaughter should be set aside if the facts do not exclude, to a moral certainty, every reasonable hypothesis but guilt (e.g., People v Montanez, 41 NY2d 53, 57-58, supra).
In this case, the People’s proof was not solely circumstantial. Rather, defendant’s own admissions, as related by prose *559 cution witnesses, constitute direct evidence of many of the principal facts in issue (see People v Rumble, 45 NY2d 879, 880). For this reason, there is no occasion to apply the rigorous standard by which purely circumstantial cases are tested (e.g., People v Benzinger, 36 NY2d 29, 32).
Nor can it be said, as a matter of law, that the evidence was insufficient to establish a case of reckless homicide for submission to the jury. Viewed in the light most favorable to the People, the record demonstrates, in essence, that defendant removed a loaded revolver from his belt area, swung it across his body with his finger on the trigger, and allowed the barrel to point in the direction of another person, barely three feet away. Although the discharge of the weapon may well have been unintentional, the jury was entitled to consider whether the risk created by defendant’s actions was substantial, unjustifiable and constituted a gross deviation from the standard of conduct that a reasonable person would have observed.
In similar vein, there was ample evidence demonstrating defendant’s subjective awareness and conscious disregard of the risk. Of course, it is "defendant’s perception or nonperception of the risk of harm” which is controlling. But, as often the case with respect to state of mind questions, objective evidence of the surrounding circumstances may be weighed in making the factual determination (see, e.g., People v Stanfield, 36 NY2d 467, 472, supra). Among the factors to be considered in a case such as this are the defendant’s familiarity with weapons in general, as well as the particular gun, and his knowledge of whether the gun is likely to be loaded (see id., at p 472). Given the facts revealed by this record, including defendant’s possession of a permit for the revolver, and his admissions to the police, there is proof from which the jury could have found that defendant was well acquainted with the operation of the pistol, and knew that it was loaded at the time of the incident. From this, the jury could have properly drawn the factual conclusion that defendant was aware of the risk.*
*560 Defendant’s remaining contentions in support of the Appellate Division order of reversal are either beyond the review of this court or without merit.
Inasmuch as the Appellate Division reversal was on the law (CPL 470.25, subd 2, par [d]), there must be a remittal for a review of the facts (CPL 470.40, subd 2, par [b]). Accordingly, the order of the Appellate Division should be reversed and the matter remitted to that court for review of the facts.
Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur; Judge Fuchsberg taking no part.
Order reversed and the case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein.

 Defendant’s reliance upon People v Montanez (41 NY2d 53) is misplaced. In that case, the circumstantial evidence did not exclude, to a moral certainty, every reasonable hypothesis but guilt (41 NY2d, at pp 57-58). Specifically, the People there failed to prove their theory that defendant had recklessly threatened decedent with the revolver. Indeed, the jury could have found that the decedent, and not the defendant, produced the weapon and that defendant had only momentary possession of it before the accident. Moreover, due to the absence of ballistics testimony, the prosecution did not demonstrate that Montanez had his finger on the trigger when the weapon *560 discharged nor negate the possibility that the gun had a "hair trigger” or other infirmity which could have caused it to discharge unexpectedly. In short, the facts in Montanez did not sufficiently rebut the reasonable hypothesis that death resulted from an unavoidable accident, rather than a criminal act.